**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | |
|---|---|
| APRIL GREEN, *on behalf of herself and those similarly situated,*<br><br>         Plaintiff,<br><br>     v.<br><br>U.S. XPRESS ENTERPRISES, INC.<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br><br>         and<br><br>U.S. XPRESS, INC.<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br><br>         and<br><br>U.S. XPRESS LEASING, INC.<br>4080 Jenkins Road<br>Chattanooga, TN 37421<br><br>         and<br><br>JOHN DOES 1-20<br><br>         Defendants. | INDIVIDUAL AND COLLECTIVE ACTION FOR UNPAID MINIMUM WAGES UNDER FLSA<br><br>CLASS ACTION UNDER TRUTH IN LEASING ACT, TENN. CONSUMER PROTECTION ACT, AND COMMON LAW<br><br>     <u>JURY TRIAL DEMANDED</u><br><br>No. |

## <u>INDIVIDUAL, COLLECTIVE, AND CLASS ACTION CIVIL COMPLAINT</u>

Named Plaintiff April Green (hereinafter "Named Plaintiff"), individually and on behalf of herself and those similarly situated, by and through undersigned counsel, hereby complains as follows against Defendants U.S. Xpress Enterprises, Inc., U.S. Xpress, Inc., and U.S. Xpress Leasing, Inc., and John Does 1-20 (hereinafter collectively "Defendants").

## INTRODUCTION

1. Named Plaintiff has initiated the instant action to redress Defendants' violations of the Fair Labor Standards Act ("FLSA"). Named Plaintiff asserts that Defendants erroneously designated Named Plaintiff and those similarly situated as independent contractors and unlawfully deducted from and withheld portions of the wages owed to Named Plaintiff and those similarly situated. Specifically, Defendants required Named Plaintiff and those similarly situated to cover the costs of Defendants, intentionally reducing the wages of Named Plaintiff and those similarly situated below the minimum wage.

2. Named Plaintiff has initiated the instant action to redress Defendants' violations of the Truth in Leasing Act, 49 U.S.C. §14704 ("TILA"). Named Plaintiff asserts that Defendants entered into leases with Named Plaintiff and those similarly situated that violated the provisions of TILA.

3. Named Plaintiff has initiated this action to redress Defendants' violations of the Tennessee Consumer Protection Act of 1977, Tenn. Code. Ann. § 47-18-101. *et al.* (the "Tennessee Consumer Protection Act").

4. Named Plaintiff has initiated this action to redress Defendants' violations of the common law for unjust enrichment and breach of contract on behalf of herself and all those similarly situated.

## JURISDICTION AND VENUE

5. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

6. This Court has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under laws of the United States, the FLSA, 29 U.S.C. § 201 *et seq.,* and the TILA, 49 U.S.C. §14704, *et seq.* This Court has supplemental jurisdiction

over Named Plaintiff's state law claims because those claims arise out of the same nucleus of operative fact as the federal claims.

7. This Court also has jurisdiction over Named Plaintiff's state law claims pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million and at least one member of the putative class is domiciled in a state different from the domicile of any Defendant.

8. This Court may properly maintain personal jurisdiction over Defendants, because Defendants' contacts with this state and this jurisdictional district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice.

9. Venue is properly laid in this judicial district pursuant to 29 U.S.C. § § 1391(b)(1) and (b)(2), because Defendants reside in and/or conduct business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

## PARTIES

10. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

11. Named Plaintiff April Green is an adult individual residing at 85 Pebbles Brooke Ct., Covington, GA 30016.

12. Named Plaintiff is informed and believes, and thereon alleges, that Defendants are companies engaged in the business of hauling and delivery of freight by truck.

13. Named Plaintiff is informed and believes, and thereon alleges, that U.S. Xpress, Inc. and U.S. Xpress Leasing Inc. are subsidiary corporations of U.S. Xpress Enterprises, Inc. Plaintiff is further informed and believes, and thereon alleges, that because of the interrelation of operations, common management, centralized control of labor relations, common ownership, common financial controls, and other factors, Defendants are sufficiently interrelated and

3

integrated in their activities, labor relations, ownership, and management that they may be treated as a single employer for purposes of this legal action and that each has liability for the act of the other as herein alleged.

14.     Named Plaintiff is informed and believes, and thereon alleges, that Defendant U.S. Xpress Enterprises, Inc. is responsible for creating and promulgating the pay policies and other practices at issue in this action. Defendant U.S. Xpress Enterprises, Inc. controls such policies and practices by supervising and directing staff at Defendants U.S. Xpress, Inc. and U.S. Xpress, Leasing, Inc.

15.     Defendants share a principal place of business at 4080 Jenkins Road, Chattanooga, TN 37421.

16.     As a condition of their employment for Defendants, Defendants required Named Plaintiff and those similarly situated to enter into Equipment Lease Agreements ("Lease Agreements") with U.S. Xpress Leasing, Inc., whereby Named Plaintiff and those similarly situated were required to lease a vehicle from U.S. Xpress Leasing, Inc.

17.     As a condition of entering into the Lease Agreements with U.S. Xpress Leasing Inc., U.S. Xpress Leasing Inc. required Plaintiffs to enter into Independent Contractor Agreements ("Contractor Agreements") with U.S. Xpress, Inc., whereby Named Plaintiff and those similarly situated subleased the tractors and their driving services to U.S. Xpress, Inc. via the Contractor Agreements.

18.     The Lease Agreements between Named Plaintiff and those similarly situated and Defendant U.S. Xpress Leasing, Inc. require Named Plaintiff and those similarly situated to drive only for Defendant U.S. Xpress, Inc., or default on their Lease Agreements, subjecting Plaintiffs to significant financial penalties.

4

19.     Defendants John Doe 1 through John Doe 10 are presently unknown persons or entities who directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices of Defendants, which resulted in Defendants failing to pay Named Plaintiff and those similarly situated proper compensation pursuant to the FLSA.

20.     Defendants John Doe 11 through John Doe 20 are presently unknown persons or entities who had control over processing payroll regarding Named Plaintiff and those similarly situated.

21.     At all times relevant herein, Defendants acted by and through their agents, servants, and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

## FLSA COLLECTIVE ACTION ALLEGATIONS

22.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

23.     Named Plaintiff brings this action for violations of the FLSA as an individual action and as a collective action pursuant to Section 16(b) of the FLSA, 29 U.S.C. § 216(b), on behalf of all persons who performed work as lease operators and who were designated as "independent contractors" by Defendants at any point during the three years preceding the date the instant action was initiated (the members of this putative class are hereinafter collectively referred to as "Collective Plaintiffs").

24.     Named Plaintiff and Collective Plaintiffs are similarly situated, have substantially similar job duties, have substantially similar pay provisions, and are all subject to Defendants' unlawful policies and practices as described herein.

25.     There are numerous similarly situated current and former employees of Defendants who were compensated in violation of the FLSA and who would benefit from the issuance of a Court Supervised Notice of the instant lawsuit and the opportunity to join the present lawsuit.

26.     Similarly situated employees are known to Defendants, are readily identifiable by Defendants, and can be located through Defendants' records.

27.     Therefore, Named Plaintiff should be permitted to bring this action as a collective action for and on behalf of themselves and those employees similarly situated, pursuant to the provisions of the FLSA, 29 U.S.C. § 216(b).

## CLASS ACTION ALLEGATIONS

28.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

29.     Named Plaintiff brings this action for violations of TILA, the Tennessee Consumer Protection Act, and the common law as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who performed work as lease operators or in similar positions, who leased equipment from Defendants and who were designated as "independent contractors" by Defendants, and who worked in this capacity at any point during the applicable statute of limitations (the members of this putative class are hereinafter collectively referred to as "Class Members").

30.     The class is so numerous that the joinder of all Class Members is impracticable. Named Plaintiff does not know the exact size of the class, as such information is in the exclusive control of Defendants; however, on information and belief, the number of potential Class Members is over one-hundred.

31.     Named Plaintiff's TILA claims are typical of the claims of Class Members because Named Plaintiff and all Class Members signed substantively similar lease agreements which contained terms and conditions which are unlawful pursuant to the TILA.

32.     Named Plaintiff's Tennessee Consumer Protection Act claims are typical of the claims of Class Members because such claims are based on common deceptive and misleading statements of Defendants upon which (1) secured the first contact and/or interview of Named Plaintiff and Class Members; and (2) there is a likelihood that Named Plaintiff and Class Members would not have entered in the Lease Agreements and Contractor Agreements if the true facts were disclosed.

33.     Named Plaintiff's common law claims for unjust enrichment and breach of contract are typical of the claims of Class Members because Defendants uniformly failed to follow the Lease and Contractor Agreements as written and were unjustly enriched by receiving from Named Plaintiff and Class Members work at sub-minimum wage levels.

34.     Named Plaintiff will fairly and adequately protect the interests of the Class Members, because Named Plaintiff's interests are coincident with and not antagonistic to those of the class.  Named Plaintiff has retained counsel with substantial experience in the prosecution of claims involving employee wage disputes.

35.     No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action.  The class will be easily identifiable from Defendants' records.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Such treatment will allow all similarly situated individuals to prosecute their common claims in a single forum simultaneously.  Prosecution of separate actions

by individual members of the putative class would create the risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for Defendants. Furthermore, the amount at stake for individual putative class members may not be great enough to enable all of the individual putative class members to maintain separate actions against Defendants.

37. Questions of law and fact that are common to the members of the class predominate over questions that affect only individual members of the class. Among the questions of law and fact that are common to the class are: (1) whether Defendants violated TILA with respect to the agreements signed by Named Plaintiff and Class Members; (2) whether Defendants' statements made regarding their lease purchase program to Named Plaintiff and Class Members were false; (3) whether Defendants breached the Lease Agreements and Contractor Agreements by failing to provide compensation as promised, by failing to provide interest as promised, and by making deductions from wages that were not authorized by the Agreements, and (4) whether Defendants were unjustly enriched by their relationships with Named Plaintiff and Class Members.

## STATUTORY AND REGULATORY FRAMEWORK

38. The foregoing paragraphs are incorporated herein as if set forth in their entirety.

39. The federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, were developed by the Interstate Commerce Commission out of grave concern for the plight faced by Lease Drivers and within the trucking industry. The regulations govern the leases between motor carriers and operators of trucks, and were enacted to create transparency in the terms of the equipment and driver services leases to help combat illegal practices by motor carriers such as skimming from owner-operator compensation. In furtherance of this goal, and with the express intent of alleviating the burden placed on owner-operators by the significant disparity in bargaining power

that largely defines their relationship with motor carriers, the Truth-in-Leasing regulations provide standards of conduct to be incorporated in written leases that govern the contractual relationship between the owner-operator and motor carrier.

40.     To protect owner-operators from abusive business practices by motor carriers, the Truth-in-Leasing regulations prescribe certain terms and conditions that govern these relationships:

a.  "[A]uthorized motor carriers" such as 49 C.F.R. § 376.11(a) may perform authorized transportation in equipment that they do not own *only* if the equipment is covered by a written lease meeting the requirements set forth in 49 C.F.R. § 376.12.  *See* 49 C.F.R. § 376.11(a).

b.  The conduct and business practices of authorized motor carriers must comply with the Truth-in-Leasing regulations irrespective of whether their written lease agreements satisfy the requirements of the regulations. 49 C.F.R. § 376.12.

c.  When a driver leases his or her equipment to an authorized motor carrier, the compensation for the equipment and services must be "clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d).

d.  A driver may not be required to purchase any products, equipment or services from the authorized carrier as a condition of entering into the lease.  49 C.F.R. §376.12(i).

e.  An authorized carrier may make deductions from a driver's compensation for items initially paid for by the carrier *only* if those items are clearly specified in

the lease and then *only* if the lease recites how the amount of each deduction is computed. 49 C.F.R. §376.12(h).

f.  The lease must inform the driver that he or she is entitled to copies of those documents which are necessary to determine the validity of the charge. 49 C.F.R. §376.12(h).

g.  Where an owner-operator driver is required to deposit funds with the carrier to cover certain specified costs, such "escrow funds" are monies which belong to the owner-operator drivers. 49 C.F.R. §§376.12(k)(2), (6).

h.  Where escrows are required, the lease must clearly specify how the money can be used and the money can only be used for actual obligations incurred by an individual driver. 49 C.F.R. §§376.12(k)(2), (6).

i.  The carrier must provide periodic accountings to drivers, and, upon termination of the relationship with the carrier, a final accounting reporting all transactions involving the escrow fund. 49 C.F.R. §376.12(k)(3), (4), (6).

j.  The carrier must pay interest to the driver on amounts deposited in escrow on at least a quarterly basis. 49 C.F.R. 376.12(k)(5).

k.  Following termination, all unused escrow funds must be returned to the driver within 45 days from the date of termination. 49 C.F.R. §376.12(k)(6).

l.  By statute, each motor carrier providing transportation of household goods is responsible for all acts or omissions of its agents which relate to the performance of such transportation. 49 U.S.C. § 13907.

m.  An authorized carrier is obligated "to ensure that [owner-operator drivers] receive all of the rights and benefits … under the leasing regulations…"

regardless of whether the lease is between the authorized carrier and the driver or between the authorized carrier and its agent.  49 C.F.R. § 376.12(m).

41.     49 U.S.C. § 14704(a)(1) and (2) authorizes owner-operator drivers to bring legal actions for injunctive relief and damages to enforce the federal Truth-in-Leasing regulations.  49 U.S.C. § 14704(e) authorizes an award of attorney's fees to owner-operator drivers in such cases.

## FACTUAL BACKGROUND

42.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

43.     Named Plaintiff worked for Defendants as a commercial truck driver from in or around September of 2018 through in or around January of 2019.

44.     At all times relevant, Defendants designated Named Plaintiff, Collective Plaintiffs, and Class Members as independent contractors.

45.     At all times relevant, Named Plaintiff, Collective Plaintiffs, and Class Members (hereinafter collectively "Lease Purchase Drivers") leased trucks from U.S. Xpress Leasing, Inc. for the purpose of driving freight for Defendants.

**Named Plaintiff, Collective Plaintiffs and Class Members**
**Were "Employees" under Federal Law**

46.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

47.     Defendant U.S. Xpress, Inc. is a motor carrier as defined by the Motor Carrier Act.

48.     Defendant U.S. Xpress, Inc's primary business is to provide transportation of cargo for hire.

49.     Defendant U.S. Xpress, Inc. provided to Lease Purchase Drivers Contractor Agreements, which purport to classify Lease Purchase Drivers as independent contractors.

50. Defendant U.S. Xpress, Inc. provided said agreements to Lease Purchase Drivers under the guise that Lease Purchase Drivers would be participating in Defendants' Lease-Purchase Program.

51. Defendants advertise their Lease-Purchase Program as a way for a driver to work for U.S. Xpress, Inc., earn more than $175,000 per year, and at conclusion, have full title to a commercial tractor.

52. In order to participate in the Lease-Purchase program, Defendant U.S. Xpress, Inc. required Lease Purchase Drivers to execute a Lease Agreement with U.S. Xpress, Leasing, Inc.

53. As a condition of entering into the Lease Agreement, Lease Purchase Drivers were required to maintain Contractor Agreements with and work for Defendant U.S. Xpress, Inc. to avoid defaulting on the Lease Agreement.

54. The Contractor Agreement and the Lease Agreement were presented as a single agreement requiring Lease Purchase Drivers to execute both agreements at the same time.

55. For example, Named Plaintiff's Lease Agreement and Contractor Agreement are provided in the same "DocuSign Envelope ID." The documents were sent via a single link and presented as a single agreement.

56. Pursuant to the Lease Agreement, Lease Purchase Drivers may only operate the leased vehicle "pursuant to the Contractor Agreement entered into with [U.S. Xpress, Inc.]."

57. Pursuant to the Lease Agreement, Lease Purchase Drivers are in default of the Lease Agreement if "the Contractor Agreement between [the Lease Purchase Driver] and [U.S. Xpress, Inc.] is terminated by either party for any reason or otherwise expires, and [the Lease Purchase Driver] fails within two (2) days thereafter to enter into a new Contractor Agreement

with [U.S. Xpress, Inc.] acceptable to [U.S. Xpress Leasing, Inc.] in the exercise of [U.S. Xpress Leasing, Inc.'s] sole discretion."

58.     Pursuant to the Lease Agreement, U.S. Xpress, Leasing, Inc. "maintain[ed] all right[s], title, and interest in and to the Equipment for the entire term… [The Lease Purchase Driver] shall not assign, mortgage, encumber, or transfer this Agreement in whole or in part, or sublet the Equipment or any part thereof, or grant license or concession in connection therewith, without [U.S. Xpress Leasing, Inc.'s] prior written consent."

59.     Pursuant to the Lease Agreement, the owner of the leased vehicle during the lease term was U.S. Xpress, Leasing, Inc., and the Lease Purchase Driver has no rights of an owner of the vehicle, including claiming depreciation of the vehicle for tax purposes.

60.     Pursuant to the Contractor Agreement, U.S. Xpress, Inc. may terminate the Contractor Agreement at any time and for any reason by providing three days written notice.

61.     Pursuant to the Contractor Agreement, the leased vehicle "shall be for [U.S. Xpress Inc.'s] exclusive possession, control, and use for the duration of [the Contractor Agreement]."

62.     Pursuant to the Contractor Agreement, U.S. Xpress, Inc. was permitted to place and maintain on the leased equipment "any lettering, advertisement, slogans, or designs as [U.S. Xpress, Inc.] may choose" and the Lease Purchase Driver's ability to place any signage on the vehicle was entirely in the discretion of U.S. Xpress, Inc.

63.     Pursuant to the Contractor Agreement, U.S. Xpress, Inc. may take possession of any lading entrusted to the Lease Purchase Driver and may complete the delivery of the lading with the leased equipment without permission of the Lease Purchase Driver when, in U.S. Xpress Inc.'s sole judgment, any act or omission of the Lease Purchase Driver has subjected U.S. Xpress, Inc. to liability.

64.     Pursuant to the Contractor Agreement, Lease Purchase Drivers were required to use a DriverTech device at all times when operating the vehicle.  The DriverTech Device permitted Defendant U.S. Xpress, Inc. to monitor the Lease Purchase Driver at all times, to communicate with the Lease Purchase Driver at all times, and to supervise the Lease Purchase Driver.

65.     Defendants assigned Lease Purchase Drivers a fleet manager, who acted as Lease Purchase Drivers' supervisor throughout their employment with Defendants.

66.     Lease Purchase Drivers are/were not permitted to use the commercial vehicles leased to them for any carrier other than Defendant U.S Xpress, Inc.

67.     Lease Purchase Drivers are/were not permitted to accept jobs that were assigned to them by any carrier other than Defendant U.S. Xpress, Inc.

68.     Lease Purchase Drivers were required by Defendants to attend a multi-day new-hire orientation, the majority of which was attended by both Lease Purchase Drivers, who are classified as independent contractors, and company drivers who Defendants properly classify as employees.

69.     During orientation, Defendant U.S Xpress, Inc. informed Lease Purchase Drivers of Defendants' Rules and Policies and informed Lease Purchase Drivers that they are required to follow such rules at all times during their relationship with Defendants.

70.     During orientation, Defendant U.S Xpress, Inc. informed Lease Purchase Drivers that the best "strategy" for success is to accept all loads assigned by Defendants.

71.     Defendants controlled the amount of compensation Lease Purchase Drivers could make by being the sole source of loads that Lease Purchase Drivers could take and by unilaterally setting the compensation to be provided to Lease Purchase Drivers for completing each load.

72.     Defendants controlled and directed Lease Purchase Drivers in the performance of their work.

73.     Lease Purchase Drivers had no meaningful opportunity to increase their revenue by recruiting new customers, as they are/were not permitted to recruit new customers as a consequence of being permitted to accept only loads assigned to them by Defendants.

74.     Lease Purchase Drivers can/could do little to increase their profitability other than attempt to work more hours and increase fuel efficiency.

75.     Lease Purchase Drivers are/were economically dependent upon Defendants.

76.     Lease Purchase Drivers are/were required to report their status and availability to Defendants in real time at all times when they were over-the-road.

77.     Lease Purchase Drivers are/were required to request in advance any requests for home time or time off of work.

78.     At all times, Defendants directed, provided, and supervised the work performed by Lease Purchase Drivers on their behalf.

**Failure to Pay Minimum Wage for all Hours Worked**
**(Named Plaintiff and Collective Plaintiffs v. Defendants)**

79.     The foregoing paragraphs are incorporated herein as if set forth in their entirety.

80.     Defendants' pay structure and wage deduction practices and policies regularly caused Named Plaintiff and Collective Plaintiffs' (collectively "FLSA Plaintiffs") wages to drop below the federal minimum wage of $7.25 per hour for all hours worked during a workweek.

81.     For example, on December 21, 2018, Named Plaintiff was issued a statement for work she performed during the workweek of December 12, 2018.  Her paystub shows that she performed a delivery beginning in Van Buren, Ohio and ending in Maxton, North Carolina, totaling 682 miles.  In completion of such work, the pay statement shows that Defendants owed

Named Plaintiff "taxable wages" of $861.48. Nevertheless, Defendants then deducted from those earnings Defendants' business expenses, including expenses for the tractor, insurance, and fuel. After those and other of Defendants' business expenses were deducted, Defendants paid Named Plaintiff nothing and issued a pay statement showing that **Named Plaintiff *owed* Defendants $418.62.**

82. Similar events occurred to Named Plaintiff and FLSA Plaintiffs on a regular basis.

83. Additionally, Defendants' pay structure and wage deduction practices failed to provide any payments free and clear, as payments made to FLSA Plaintiffs were conditioned on Defendants' ability to recapture such wages at a later date.

84. For example, pursuant to the Lease Agreement and Contractor Agreement which Named Plaintiff was required to enter into to work for Defendants, Defendants contend that, as a consequence of leaving the job, Named Plaintiff now owes Defendants $9,912.02.

85. As a consequence of Defendants' unlawful scheme, FLSA Plaintiffs regularly received less than the federal minimum wage of $7.25 per hour for all hours worked during a workweek.

**Violations of the Truth-in-Leasing Act**
**(Named Plaintiff and Lease Purchase Drivers v. Defendants)**

86. The foregoing paragraphs are incorporated herein as if set forth in full.

87. To help facilitate the interstate and intrastate delivery of freight, Defendant US Xpress, Inc. enters/entered into substantively similar and/or identical Contractor Agreements and Lease Agreements ("Agreements") with Lease Purchase Drivers.

88. Because the Agreements are presented as a single agreement to Lease Purchase Drivers, they are properly construed as a single agreement for purposes of determining compliance with TILA.

89. The Contractor Agreements purport to lease, on behalf of Defendant US Xpress, Inc., heavy duty trucks and driving services from Lease Purchase Drivers.

90. The Agreements are illusory and thus cannot comply with TILA. Namely, by virtue of the interrelationship of Defendants, all terms of the Agreement and are alterable and cancellable at any time by Defendants. Specifically, the Lease Agreement automatically defaults if a Lease Purchase Driver's Contractor Agreement is terminated for any reason by Defendant U.S. Xpress, Inc. The only relief a Lease Purchase Driver has to remain in compliance with the Lease Agreement following such termination is to, within two days, enter into a new Contractor Agreement with U.S. Xpress, Inc., the terms of which are unilaterally set by U.S. Xpress, Inc. and which must be agreed to by U.S. Xpress, Leasing, Inc. As a consequence, Defendants are able to terminate and alter the material terms of the Agreements at any time, rendering them illusory.

91. The Agreements do not conform to the requirements set forth in 49 C.F.R. § 376.12.

92. The Agreements contain several provisions that violate the Truth-in-Leasing Regulations, as, by way of example only:

    a. The Contractor Agreements require Named Plaintiff and Lease Purchase Drivers to indemnify Defendants and hold Named Plaintiff and Lease Purchase Drivers responsible for various claims, fees, costs and penalties. *See, e.g.* Sections (a)(7), (c), (f), (g), Appendix C. These provisions violate multiple provisions of the TILA regulations, including 49 C.F.R. § 376.12(c)(1), 49 C.F.R. § 376.12(e), and 49 C.F.R. § 376.12(h).

    b. Appendix C of the Contractor Agreements authorizes Defendant U.S. Xpress, Inc. to deduct from Named Plaintiff's and Lease Purchase Drivers' compensation any amounts for "Indemnity/hold harmless obligations" which

refers to a catch-all provision for any "any direct, indirect, and consequently, loss, damage, fine, expense … arising out of or in connection with [Lease Purchase Driver's] obligations under this Agreement."  Said provision is impermissibly vague as it permits Defendant U.S. Xpress, Inc. to charge back against Named Plaintiff and Lease Purchase Drivers compensation an undefined amount in violation of 49 C.F.R. § 376.12(h).

c. The Contractor Agreements require Named Plaintiff and Lease Purchase Drivers submit documentation beyond what is permitted pursuant to 49 C.F.R. § 376.12(f) for payment.  For example, the Contractor Agreements mandate that Named Plaintiff and Lease Purchase Drivers "send a Macro 13 via Satcom" to receive compensation for a Haz-Mat load.

d. The Agreements operate to require Lease Purchase Drivers to purchase services from Defendants, including but not limited to the following:

    i. The Contractor Agreement requires Lease Purchase Drivers to enter into a vehicle Lease with U.S. Xpress, Leasing, Inc.

    ii. The Contractor Agreement requires Lease Purchase Drivers purchase access to Defendants' DriverTech account, at an amount of $17.50 per week.

e. The Agreements fail to provide the particular expenses for which Defendants may make deductions from Named Plaintiff and Lease Purchase Drivers' escrow accounts, including the "Security Reserve" and the "Maintenance Reserve" accounts.

93.     The conduct and business practices of authorized motor carriers must also comply with the Truth-in-Leasing regulations irrespective of whether or not their written lease agreements satisfy the requirements of the regulations. *See* 49 C.F.R. § 376.12.

94.     Defendants' conduct does not conform to the requirements set forth in 49 C.F.R. § 376.12, as, by way of example only, Named Plaintiff and Lease Purchase Drivers were required to purchase insurance, satellite communication equipment and legal and maintenance services from Defendants, in violation of 49 C.F.R. § 376.12(f).

95.     As a result of Defendants' violations of 49 C.F.R. § 376.12(d) and (h), Named Plaintiff and Lease Purchase Drivers were disadvantaged by a lack of transparency and forced purchases in their contractual relationship with Defendants, resulting in damages.

96.     The above violations are mere examples of the written lease violating substantial provisions of the TILA. Moreover, many of the violations stated herein violate multiple sections of the TILA even where only one specific section is cited.

**Defendants' Breaches of the Terms of the Agreements**
**(Named Plaintiff and Lease Purchase Drivers v. Defendants)**

97.     The foregoing paragraphs are incorporated herein as if set forth in full.

98.     Pursuant to the Agreements, Defendants were to pay interest "at least equal to the average yield … on 91-day, 13-week Treasury bills" on all amounts held in the Maintenance and Security reserves each quarter, including ending on September 30 and December 31.

99.     Defendants were holding moneys in escrow on behalf of Named Plaintiff during quarters ending September 30, 2018 and December 31, 2018.

100.     Defendants failed to pay any interest to Named Plaintiff on such amounts held in escrow.

101.     Upon information and belief, Defendants failed to pay interest on the amounts held in escrow at the promised interest rates to all Lease Purchase Drivers.

102.     Pursuant to the Agreements, Defendants agreed that service performed on the leased vehicles at Carrier Terminals would be charged to Named Plaintiff and Lease Purchase Drivers at a rate of "$65.00 per Flat Rate Hour."

103.     Defendants charged Named Plaintiff well beyond $65/hour for work performed at a terminal.  As one example, after charging Named Plaintiff $2,500 to move the vehicle from Defendants' Georgia dropyard to their Georgia terminal, Defendants then also billed Named Plaintiff $225 for towing the tractor within their own terminal.  The $225 exceeds $65 per hour for work performed.

104.     Similarly, Defendants made numerous other charges to Named Plaintiff beyond the agreed upon rates in the Agreements.

105.     Upon information and belief, Defendants made similar unauthorized charges to Lease Purchase Drivers in breach of the Agreements.

**Defendants' Violations of the Tennessee Consumer Protection Act**
**(Named Plaintiff and Lease Purchase Drivers v. Defendants)**

106.     The foregoing paragraphs are incorporated herein as if set forth in full.

107.     In advertising the Lease Purchase Program to Named Plaintiff and Lease Purchase Drivers, Defendants published false material representations regarding the terms of the program and the compensation that drivers would receive.

108.     Defendants informed Named Plaintiff and Lease Purchase Drivers, via their published website and through other statements made by Defendants and their agents, that drivers entering into the Lease Purchase Program earn "up to $175,000/yr or more."

109. Defendants informed Named Plaintiff and Lease Purchase Drivers, via their published website and through other statements made by Defendants and their agents, that the lease is a "WALK-AWAY LEASE" meaning that there are "no additional penalties upon termination."

110. Despite Defendants' statements, drivers in the Lease Purchase Program do not earn more than $175,000 per year.

111. Despite Defendants' statements, Defendants charge Named Plaintiff and Lease Purchase Drivers significant financial penalties for terminating the lease. These penalties include, not are not limited to, retaining all amounts held in escrow, charging a flat $750 reseating fee, and charging $2,500 as a recovery free.

112. These false statements were designed to, and did, secure the first contact of Named Plaintiff and Lease Purchase Drivers.

113. There exists a likelihood that Named Plaintiff and Lease Purchase Drivers would not have entered in to the Agreements if the true facts regarding the Lease Purchase Program were provided to them.

**Defendants were unjustly enriched**
**(Named Plaintiff and Lease Purchase Drivers v. Defendants)**

114. The foregoing paragraphs are incorporated herein as if set forth in full.

115. To the extent that the Agreements are unenforceable and/or illusory, Defendants' conduct described above unjustly enriched Defendants at the expense of Named Plaintiff and the Lease Purchase Drivers.

**COUNT I**
**Violations of the Fair Labor Standards Act ("FLSA")**
**(Failure to Pay Minimum Wage)**
**Named Plaintiff and Collective Plaintiffs v. Defendants**

116. The foregoing paragraphs are incorporated herein as if set forth in full.

117.    At all times relevant herein, Defendants were and continues to be an "employer" within the meaning of the FLSA.

118.    At all times relevant herein, Named Plaintiff and Collective Plaintiffs were/are "employees" within the meaning of the FLSA.

119.    The FLSA requires employers, such as Defendants, to minimally compensate employees, such as Named Plaintiff and Collective Plaintiffs, at the federal minimum wage rate for each hour worked.

120.    As a result of Defendants' company-wide practices and policies of not paying their employees at least the federally mandated minimum wage for all hours worked, Named Plaintiff and Collective Plaintiffs have been harmed.

121.    John Does 1-10 are jointly and individually liable for Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at least the statutorily mandated federal minimum wage for all hours worked because they directly or indirectly, directed, aided, abetted, and/or assisted with creating and/or executing the policies and practices which violated the FLSA.

122.    John Does 11-20 are jointly and individually liable for Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at least the statutorily mandated federal minimum wage for all hours worked because they had control over processing payroll for Named Plaintiff and Collective Plaintiffs.

123.    Defendants willfully failed/fail to compensate Named Plaintiff and Collective Plaintiffs the federal minimum wage.

124.    As a result of Defendants' failure to compensate Named Plaintiff and Collective Plaintiffs at the federal minimum wage rate, Defendants have violated and continue to violate the FLSA.

**COUNT II**
**<u>Violations of the Truth in Leasing Act</u>**
**Named Plaintiff and Lease Purchase Drivers v. Defendants**

125.    The foregoing paragraphs are incorporated herein as if set forth in full.

126.    The Contractor Agreements and the Lease Agreements provided to Named Plaintiff and Lease Purchase Drivers violate numerous provisions of the Truth in Leasing Act.

127.    As a result of Defendants' conduct, Named Plaintiff and Lease Purchase Drivers have suffered damages.

**COUNT III**
**<u>Breach of Contract</u>**
**Named Plaintiff and Lease Purchase Drivers v. Defendants**

128.    The foregoing paragraphs are incorporated herein as if set forth in full.

129.    Defendants breached the terms of the Agreements.

130.    As a result of Defendants' conduct, Named Plaintiff and Lease Purchase Drivers have suffered damages.

**COUNT IV**
**<u>Violations of the Tennessee Consumer Protection Act</u>**
**Named Plaintiff and Lease Purchase Drivers v. Defendants**

131.    The foregoing paragraphs are incorporated herein as if set forth in full.

132.    Defendants violated the provisions of the Tennessee Consumer Protection Act in the manner in which it advertised, described, and marketed the Lease Purchase Program.

133.    As a result of Defendants' conduct, Named Plaintiff and Lease Purchase Drivers have suffered damages.

**COUNT V**
**<u>Violations of the Common Law – Unjust Enrichment</u>**
**Named Plaintiff and Lease Purchase Drivers v. Defendants**

134.    The foregoing paragraphs are incorporated herein as if set forth in full.

135.     To the extent that Defendants' conduct described herein is not considered to be a breach of their contractual duties owed to Named Plaintiff and Lease Purchase Drivers, Defendants were unjustly enriched by such conduct.

136.     As a result of Defendants' conduct, Named Plaintiff and Lease Purchase Drivers have suffered damages.

**WHEREFORE**, Plaintiffs pray that this Court enter an Order providing that:

(1)     Defendants are to be prohibited from continuing to maintain their policies, practices or customs in violation of federal law, state laws and principles of equity;

(2)     Defendants are to compensate, reimburse, and make Named Plaintiff, Collective Plaintiffs, and Class Members whole for any and all pay and benefits they would have received had it not been for Defendants' illegal actions, including but not limited to past lost earnings. Named Plaintiff, Collective and Class Members should be accorded those benefits illegally withheld;

(3)     Named Plaintiff, Collective Plaintiffs, and Class Members are to be awarded liquidated, treble, statutory and/or punitive damages as applicable under the laws they are suing;

(4)     Named Plaintiff, Collective Plaintiffs, and Class Members are to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable law;

(5)     Named Plaintiff, Collective Plaintiffs, and Class Members are to be awarded equitable relief, including disgorgement of profits and other relief deemed appropriate by the Court;

(6)     Any and all other equitable relief which this Court deems fit; and

(7)     A trial by jury.

Respectfully Submitted,

<em>/s Justin Swidler</em>

Justin L. Swidler, Esq.

**SWARTZ SWIDLER, LLC**

1101 Kings Highway North, Suite 402

Cherry Hill, NJ 08034

Phone: (856) 685-7420

Fax: (856) 685-7417

*Pro Hac Motion to be Filed.*

Date: March 26, 2019

## DEMAND TO PRESERVE EVIDENCE

All Defendants are hereby directed to preserve all physical and electronic information pertaining in any way to Named Plaintiff's, Collective Plaintiffs, and Class Members' employment and/or contractual relationship with Defendants, to Named Plaintiff's, Collective Plaintiffs, and Class Members' cause of action and/or prayers for relief, and to any defenses to same, including, but not limited to, electronic data storage, the Driver Information Table, Hours of Service Records, Wage Records, Resource History Data, Defendants' marketing materials (including its website), orientation materials, complaints made by any driver regarding pay, closed circuit TV footage, digital images, computer images, cache memory, searchable data, emails, DriverTech messages, driver logs, spreadsheets, employment files, memos, text messages, any and all online social or work related websites, entries on social networking sites (including, but not limited to, Facebook, Twitter, MySpace, etc.), and any other information and/or data and/or things and/or documents which may be relevant to any claim or defense in this litigation.

Respectfully Submitted,

<em>/s Justin Swidler</em>

Justin L. Swidler, Esq.

**SWARTZ SWIDLER, LLC**

1101 Kings Highway North, Suite 402

Cherry Hill, NJ 08034

Phone: (856) 685-7420
Fax: (856) 685-7417

*Pro Hac Motion to be Filed.*

Date: March 26, 2019